session. Please be seated. Will you call the first case of the afternoon, please? Is the grand Good afternoon, your honors. Karen DeGrand, on behalf of the appellants, Dr. Libby Kristal and Illinois Valley Eye Institute SC. With me today is Mr. Adam Chaddick, also on behalf of the defendants. May it please the court and counsel. The trial judge stated at the hearing on the post-trial motion, and I quote, the causal connection really bothers me. And I think that comment truly sums up our appeal both on the request for a J&OV and the request for a new trial. Plaintiff devoted quite a bit of his brief to arguing the standard of care issues, but that truly is arguing apples to oranges, because our only challenge to the sufficiency of the evidence was on the issue of causation. The plaintiff had the burden of showing that the alleged delay in treatment by Dr. Kristal was a substantial factor contributing to the injury that the plaintiff identified. He couldn't rely on possibilities, he could not rely on contingencies, he could not rely on speculation. He had to show a true nexus between the deviations from the standard of care and the injury. Plaintiff framed the injury as the loss of some usable vision. He did not attribute the infection in his eye to Dr. Kristal. To the contrary, he conceded that negligence or not, this devastating infection was going to cause permanent damage. The plaintiff claimed that he should have survived with some useful vision in his eye and tail. So what caused the injury? According to Dr. Smith, the plaintiff's sole expert, the plaintiff's eye was infected with streptococcus cerevis on Saturday morning, July 21st, and he needed to see an ophthalmologist who could diagnose it and see that he got treatment. In other words, a delay. Dr. Smith, again, the plaintiff's one and only expert witness, tried to but couldn't link the deviations that he identified because of two insurmountable facts. First, everyone agreed that at some point on Saturday morning, Mr. Riker crossed Rubicon. But where was the point of no return? Dr. Smith, by his own testimony, had no idea where the plaintiff was with this horrible, and that was his word, disease on the morning of July 21st. Dr. Smitty, the defense expert, thought that it was over, nothing could be done when he woke up that Saturday morning. And the plaintiff conceded that there was no deviation from the standard of care before Saturday. Dr. Smith had to admit, and this becomes very clear, Volume 5, pages 137 to 142 of the record, that he really didn't know. His best estimate was that the plaintiff could have saved some usable vision with treatment by around 10 or 10.30. And again, those are his words. He was very candid, frankly, in acknowledging this gap. And that, plus the plaintiff's own testimony about experiencing pain all week long, which went and basically gutted the foundation for this graft testimony, because Dr. Smith started with the idea that he didn't have pain in his eye until Saturday morning. And it rocked the foundation and rocked, frankly, Dr. Smith's testimony off the foundation for his causation opinions. Geography was the second factor that caused essentially a perfect storm. The plaintiff's theory was that he had an undetermined but admittedly very short period of time to get treatment by a specialist for a chance to save the eye and save some vision. He needed an ophthalmologist, according to Dr. Smith, to diagnose the infection and probably a retinal surgeon to treat it. So here we are, Saturday morning, he's in the emergency room at 7.10 a.m., Dr. Crystal's in Chicago, and nobody said that she couldn't go to Chicago, and I hope we don't ever have a rule that says our doctors can't leave town. And there's no ophthalmologist in town. So Saturday morning, offices are closed. So the jury had to speculate as to what Dr. Crystal was supposed to do and when she was supposed to do it, because Dr. Smith never said. Under these unique circumstances, with this perfect storm, with this virulent, fast-moving infection, and Saturday morning, small hospital, no ophthalmologist on staff, Dr. Smith had to fill the gaps to provide a factual basis for his testimony. So that the jurors could have something from which to draw this inference. Dr. Smith didn't do it. The jurors were left to speculate, and I think we know from the verdict that indeed they did. The trial judge's comments at the hearings, both on the motion for directed verdict and on the post-trial motion, I think are very revealing. He seemed to have a misconception that all he had to do was to look and see, did Dr. Smith utter the words, did he utter the conclusion about an ophthalmologist would have put all of this together somehow, some ophthalmologist, and gotten the vitrectomy accomplished in time. And the judge said, he gave the opinion, and I think it was up to the jury. But the problem is, the judge had to do more than that. He had to look beyond the conclusion at the foundation. That was his job. Dr. Smith didn't have a factual foundation. His own statements showed he didn't have a factual foundation. The known physical facts didn't support his conclusions. If the court doesn't have questions on that aspect of it, and that's the basis for our request for J&OV. And also, alternatively, for a new trial on the manifest way standard. But barring any questions, I'll move to the new trial issues. Dr. Keyshore, if the court doesn't agree that this is a J&OV situation, still look at that causation testimony, because undeniably it was weak. And the weakness of the testimony shows how very crucial the trial errors were. They either pertained to causation, or they assisted the plaintiff in masking the lack of causation. And again, as with the J&OV argument, I will start with the comments of the trial judge. And it's clear from the transcript, and this is in volume 10 of the record of the transcript of proceedings, the judge gave a lot of thought. He looked at the transcript very carefully. And he said at the hearing, I made a mistake. I should not have stopped defense counsel from questioning Dr. Keyshore. Again, Dr. Keyshore was the retinal surgeon who came in and treated the plaintiff, wasn't a defendant, so he was testifying as an independent, doesn't know anybody, anything observer. And he also obviously had knowledge of the case because he was a treating physician. The judge said I shouldn't have stopped defense counsel from questioning this crucial witness. He said I was wrong. I was wrong on direct examination, I was wrong on redirect examination. And again, I apologize if I'm repeating myself, but I can't overemphasize how important Dr. Keyshore's testimony was to the defense. Because already the plaintiff is on thin ice with the causation testimony. So we have Dr. Smitty, who is a very renowned retinal surgeon, and he comes in and he gives causation testimony that articulates the defense, that there was nothing that could be done on Saturday about this infection. Of course, the very able and experienced plaintiff's counsel attacked Dr. Smitty with great zeal, based on the enormous amount of money supposedly that he was being paid to give his opinions, hired gun, he didn't use the hired gun words, but giving that idea, and just went after him. Really went after him. So what did the defense need, probably more than anything else, was a neutral witness who could support the causation defense. And that's exactly what Dr. Keyshore could have been. And it was very clear from his deposition that he agreed with Dr. Smitty, that the patients who are unfortunate enough to have this particular bacteria do not do well. And it wasn't just that he said vaguely they don't do well, he said they lose their eye. He said he thought this patient, this patient, not just the general patient, would have lost his eye. At trial, though, he gets on the scene, he equivocates. And so the question is asked, do you have an opinion as to whether earlier treatment about 10.30 on Saturday morning, as to this particular patient, would have made a difference in the course and outcome. And instead of giving the same testimony that he gave at his deposition, he gives sort of, well, in general, earlier treatment is better. We see that. Well, that's not an answer to the question. Defense counsel comes again. What about strep salivarius, given this patient's character resistance? And then again, back to the general. A lot of times when you have aggressive bacteria like this, yeah, not very good. Defense counsel tries to make his question more specific again. He goes to ask it, objection, ask and the answer is sustained. Okay, so then the plaintiff goes through with his questioning. He asks Dr. Keyshore, among other questions, about the necessity for cramp treatment for endophthalmitis. And then on redirect, when defense counsel comes back to the issue, the court sustained an objection that it was beyond the scope of redirect, which it wasn't, and he wouldn't allow the impeachment. So at the hearing in the post-trial motion, Judge Lannon was very candid. He said, I made a mistake, and the truth of the matter is, he did make a mistake. He was being very honest. I shouldn't have sustained asked and answered. I should have let him correct it on redirect examination. The specific question had not been asked and answered. And then Judge Lannon acknowledged that he erred, and he didn't just acknowledge an error. He acknowledged how crucial it was. It would have been, and now I'm quoting, not helpful, not very helpful, very, very helpful to the defense, but I don't think it necessitates a new trial. That's exactly what he said. I don't understand how the first winds up with a second conclusion, because isn't that the definition of reversible error? An error that is significant and prejudicial. And I think, and I submit and request that this court find that it was significant and prejudicial and requires a new trial. The special interrogatory. Thank you. Similarly inexplicable. Was the type of bacteria in Marvin Riker's right eye the sole proximate cause of the injury that he suffered? The judge found that the phrase sole proximate cause would confuse the jury. I don't follow that at all, because the judge had already instructed the jury on 1205, the sole proximate cause defense. So the reasoning is not consistent. And the case law is very clear that as long as the special interrogatory is in the right form and it's clear, understandable, supported by the evidence, you've got to give it. It focused on its positive element of the claim. If the jury would have said verdict for plaintiff, but also no to this question, or rather yes to this question, I'm sorry, then the verdict would have had to have been for the defendant, and the defendant certainly was entitled to have the verdict tested in that manner. The statute says so. It's not discretionary. This error by itself also denied the plaintiff a new trial, or rather denied the defendant a new trial, and certainly in conjunction with everything else that was going on shows the defendants were entitled to a new trial. There's other significant issues. I'm mindful of my time. I won't address them all. They're fully addressed in our brief. I believe that the repetitive issues instruction overemphasized negligence and told the jury, don't worry about causation. All you have to do is be convinced that this doctor did something wrong the way she managed the case. We don't care about causation. And that's another basis for the court to conclude that there was reversible error. Unless the court has questions, I will sit and reserve a few minutes for rebuttal. Thank you. Mr. Reculia? Good afternoon, your honors. Fortunately, I tried this case when I was there, so I'm aware of some of the things that counsel suggested to the court that certainly was not in the record and did not occur. I'd like to first of all approach the argument about the two expert witnesses, Dr. Smith and Dr. Smitty. First of all, I appreciate the compliment about my cross-examination of Dr. Smitty, but I believe more importantly the cross-examination went beyond the $25,000, $30,000, $35,000 that he charged for his services. My cross-examination, and the record will reflect this, talked to Dr. Smitty about his authoring a publication that was right on point with the issue involving endophthalmitis. And it was Dr. Smitty's position that there were certain red flags that occurred as a result of an infection that falls within the scope of endophthalmitis, which we all agreed was a very serious infection. And he indicated in his own publication that he authored that for patients presenting with visual acuity better than light perception, final visual acuity was equal in the PPV versus vitreous biopsy groups. Patients with post-operative endophthalmitis who presented only LP, light perception, with LP, light perception vision, and I am assuming that is light perception, had a better visual outcome with immediate PPV. Do you remember, and that was a question, do you remember making that as a part of your written article? Answer, I honestly don't remember that, but it doesn't sound like there is anything reprehensible or disagreeable about that statement. Question. Well, what I would like to know is how do you answer the fact that as opposed to the article that Mr. Riker did in fact have finger counting, that's visual acuity, is it not? Answer, yes. And according to the EVS study, which was the writing that he authored, having visual acuity lends more of a probability that doing the kind of treatment necessary would likely give him a potential at least of having some good visual outcome. Isn't that true? And then he says in his answer, in spite of what the article indicated and was read to him, I don't think that properly represents with what you just read. And I said, well, that's up to the jury to decide. Now, why is that important? It's important because he starts out in his testimony originally when called on by the defendant to suggest that at 4.15 in the morning, that was it. There was no basis for treatment that would do anything to provide any relief to that plaintiff. The plaintiff was going to be blind and was going to lose his eye at 4.15 in the morning. And that was his testimony. That was contradicted. And what you have here with these two experts, your honors, is contradiction, contrary testimony, not just concerning standard of care, but also proximate cause. You have to go back. You have to go back to the facts in this case to understand thoroughly why Dr. Smith's position on this particular issue is the correct one. First of all, Dr. Crystal saw the patient on a Friday. The patient complained of pain. The patient had tearing. The patient was told by doctor, and it was in the record, told by Dr. Crystal, that at some point she was going to have to get a retinal surgeon to go in to take care of the fragments that were left in his eye. She had left fragments in the anterior portion of the eye, which was not a good thing. In addition, she tore. There was a tear performed during this cataract surgery. Why is that important? Because what she did was gave me an opening to suggest to the jury a term that she used to create the environment for suggesting to the jury that it was her negligence that caused this problem. She said the tear was a gateway for bacteria. She knew it. She said it. And she knew it before Saturday, because it was done before Saturday. This was a gateway to bacteria. Now, why is that important? Counsel is right. There is no question about deviation from the standard of care about Friday. But if you know on Saturday when you get the symptomology that was presented to her that you have created a gateway for bacteria, then you better well do something more than what she did, and that was send this poor man to an optometrist. To an optometrist. Now, that's the facts that you must listen to, because the morning of that Saturday at 4.15, what happened was this man woke up in severe pain, severe pain. He didn't know what to do, and finally decided he would call St. Margaret's Hospital to see if the ER was available. He went to the ER at 6 o'clock in the morning. Now, one of the comments made by counsel is rather ironic. She says this is a small hospital that doesn't have the facilities. Well, if you look in the record, Dr. Crystal removed the cataracts at St. Margaret's Hospital. This is where Mr. Riker had his cataract removal, and if she felt that St. Margaret's Hospital was certainly a facility capable of handling her surgical procedure to remove cataracts, certainly that hospital was equally capable of handling an ophthalmologist to appear at the hospital to help with this poor man's situation. The plaintiffs have never suggested in the record, and you'll see that in the record, that there wasn't going to be a bad outcome. The bad outcome was he was going to have poor vision, but he would keep his eye, as opposed to no vision and losing his eye. That's the difference. We assert to the court that because of the lack of treatment, and I'll get to that, because of the lack of treatment, this man suffered the problem that he suffered. Now, look, let's look at the facts. He goes to the emergency room at 6.30 or 7 o'clock. He's triaged. There is a doctor there, Dr. Insion. He immediately realizes what the problem is from the history that he takes from the folks, and then finds out who the doctor was that did the surgery, calls that doctor on the cell phone, gets her finally after two or three attempts. Now, no one's suggesting that she shouldn't have gone to Chicago. There isn't certainly a reason why that we would suggest that she didn't have a right to go to Chicago for the weekend. with her patient. Now, keep in mind that the first surgical procedure was fine. She didn't have that problem in the first surgical procedure. It's now the second procedure that she knows, has to know, there's something going on. What does she do? Dr. Insion says that she told him to wait. She get back to him, and she did. But she told Dr. Insion that she would, if he testified to this, she would come back to Ottawa, and that she was going to set up an appointment for this man to meet with her in Ottawa. The second phone call that came in, now this is all within 7.30, 8 o'clock, 8.30. The second phone call that came in indicated, I'm not going to send him to an ophthalmologist. No, I'm going to send him to an optometrist. So she decides to tell Dr. Insion to send this man over to the optometrist. I can't think of her name right offhand, but in any event, it's in the record, and that the optometrist would render the care or see her, see him, and decide what the problem was. Now, I don't want to lose track of this. The optometrist, at some point in the record you'll read, said to me, I said, when you discharged that man, did you believe that he needed an ophthalmologist to take care of him at 11.30 or noon? And her answer was yes. He needed an ophthalmologist at 11 o'clock Saturday. Now, in any event, he goes to the optometrist. The optometrist does whatever she can do. She's on the phone with the defendant, Crystal, and what do they decide? I can't fault the optometrist. She herself realized her limitations. Dr. Crystal offers pressure, ocular pressure medication. They provide that ocular pressure medication, keep him there, to see what the impact was. It went from 48, which is significantly higher than you should have, to 41. And that's significant in and of itself. That's after an hour of the treatment by medication. So what does Dr. Crystal do? At that point, she's made aware of this particular situation. She doesn't get a hold of an ophthalmologist. She tells the optometrist to discharge him home on some further pressure medications. In the record, it'll say that, in questioning by me, the optometrist did not want to discharge this man. She kept him there longer rather than discharge him. After he's discharged, he goes home and waits. Nothing happens the entire day. Here's a man who has some inflammation, obviously, that is extremely painful. And even Dr. Smitty indicated that he agreed with my statement to him that if there was bacteria at 4 o'clock in the morning on that Saturday, creating this problem, I said, wouldn't you agree that by 8 o'clock that night that that bacteria would be progressing and increasing and increasing and increasing? And his answer was yes. Why is that important? Because Dr. Crystal did not contact, speak directly to, or have anyone in the ophthalmology field consult with Mr. Riker until 8 o'clock that night she made a phone call to his home. And at that phone call indicated that, how are you doing? Now, there's some inconsistencies in what the conversation said, but apparently the jury must have believed Mr. Riker because Mr. Riker said, not well. I need a doctor. Let me – can I ask you something, Mr. Rikulia? Because it's almost like you and the defense counsel here today are kind of on parallel roads. You're pointing out what's in the record, but it seems to me that the defense counsel's argument is, look, we're not talking about whether there was any negligence on our client's part. We're talking about whether the negligence was the proximate cause and the trial judge erred by keeping out, not allowing the evidence of the subsequent treating physician who said – Thank you. Thank you. I got carried away and I went too long on the wrong thing. First of all, this is how this happened. I didn't call this doctor. Dr. Cashore was called by the defendant. He did give a deposition that I attended. I felt that it wasn't important for me to talk to Dr. Cashore. They called Dr. Cashore. Remember, this is direct testimony coming from Dr. Cashore. And by the way, I think that if Mr. Lannan, Judge Lannan, would have felt as strongly as counsel put to you his position, he would have granted a new trial. Why wouldn't he have granted a new trial? I mean, there it was. He had the power to do that if he felt that strongly about it. Apparently, he didn't feel that strongly about it, felt maybe it was something that should have gone the other way, but not that strongly enough to give a new trial. But let's get back to your question. The questions were placed by Mr. Pretorius in direct examination. If I didn't ask a question, consider this, what if I said I waived cross-examination? Where was Mr. Pretorius? Where was he going to go? The answers had come to Mr. Pretorius during direct examination, and he didn't do anything about it. He didn't take the deposition as what he should have done and what this court, as any trial lawyer would have done, and said, no, wait a minute, doctor. And you know, even though you called this witness, you can impeach your own witness under the rules today. He didn't finish the thought. And said, doctor, didn't you say this at such and such a date? Didn't you say this at such and such a date? He didn't do that. He just quit. He said I have no further questions. Now, what if I would have said, I don't have any questions. Would we be here with that problem today? No, because he didn't do what he was supposed to do procedurally, and that was at that time bring up the so-called impeachment. So when I cross-examined him, I stayed away from that. By staying away from that, when he tried to redirect us and allow you to impeach a witness, only if it's related to the cross-examination. Now, how unfair would that have been to me? Strategically, he could have said, I'm going to wait until cross, then I'm going to impeach this doctor. Mr. Raccool, you won't be able to cross-examine him again, because he can't recross. That's the rule. So that's what the situation was with Dr. Kishore. It wasn't as you would think that there was some limitations that Lannan put on this. Lannan put the limitations on the basis that he didn't do what he should have done. He made a mistake by not impeaching that witness in direct. I wish I could talk about that. I'm trying not to take the bait and argue standard of care. We don't concede standard of care. We're saying that that was a fact question. So almost all of the argument here, just like in the briefs, just like at trial, is that Lannan did not do what he should have done. I will address that, Your Honor. Thank you. And the answer is, he was trying to get there, and he was stopped with an asked-and-answered objection that should not have been well taken, while he was trying to set a standard of care. And that's exactly what the judge recognized when he reread the transcript and commented on it at the post-trial motion. And I take issue with the notion that he, the judge, didn't really think this was too big of a deal, because he makes it clear in the transcript that he thought it was a big deal. And counsel was trying to get there. And the idea that the issue was not... I can't say what would have happened if he hadn't asked his questions on cross, but the fact of the matter is, he did ask his questions on cross. Page 34, volume 7. That's when plaintiff's counsel went right back to that issue. And that's why we should have had the ability to revisit it on redirect, and we were stopped. And that's why the trial judge, I believe, said he was wrong on direct, he was wrong on redirect. It was not beyond the scope. I think it's very interesting that we didn't hear one word, I don't believe I heard one word about Dr. Smith, or addressing any of my discussion of Dr. Smith's testimony. And I believe I've been very measured and careful in not overstating Dr. Smith's testimony, and the court can read the record as well as I can, so I'm not going to say more about it. But Dr. Smith did not have a foundation for his conclusion. It was pure speculation on causation. I didn't hear one word about special interrogatory, I didn't hear one word about issues. And I think that's because those rulings weren't defensible. This business about the rent and the fragments, all of those things were established by plaintiff's expert, as well as the defense, to not be negligence. But it was important in the context of what Dr. Crystal was doing, that because she had seen a fragment in the anterior portion of the eye, that's why her assumption was reasonable that the likely cause of these problems on the day, that is Saturday, was the retention of this fragment, and not this awful, horrible, to use Dr. Smith's word, infection. So I couldn't help myself, I had to comment on that one standard care issue. As far as Dr. Kunkel was concerned, and as far as the treatment that was given during the day on Saturday, it was not just medicine to bring down the pressure, it was also antibiotics. And Dr. Kunkel did not say that the patient had to be seen by an ophthalmologist. She agreed that the patient should be in the care of an ophthalmologist, and she said he was in the care of an ophthalmologist. He was in the care of Dr. Crystal, who was trying to manage the situation as best she could, but because of this devastating infection, it didn't matter. She couldn't do anything about it. And that's really what this record shows. So I will conclude, unless the court has any other questions, by saying I do believe we're entitled to a judgment notwithstanding the verdict, but at the very least, my client is entitled to a fair trial, and I think mistakes were made. She did not get a fair trial. She's not entitled to a perfect one, but she's entitled to have her testimony, her case brought forth on causation. She was entitled not to be impeded by being stopped, and she was entitled to be prevented from having this crucial witness testify and tell exactly what he thought about causation. She should have been allowed to test the verdict with that special interrogatory that was in proper form, and she should have had issues, instructions that truly defined the issues in a non-argumentative way, and one that didn't blast the jury with negligence, negligence, negligence, and gave the jury a fair picture of what they were to consider. Thank you so much, Your Honors. Thank you, Ms. DeGran. Mr. Reculia, thank you. This matter will be taken under advisement and a written disposition will be issued. Court will be in a brief recess for a panel change before the next case.